UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVEN COTTEN,

          Plaintiff,

v.                        Case No.  8:08-cv-251-T-33TGW

HFS-USA, INC.,

          Defendant.

_____/

## ORDER

This matter comes before the Court pursuant to Defendant
HFS-USA, Inc.'s Motion for Summary Judgment (Doc. # 24), filed
on December 23, 2008, and Plaintiff's response in opposition
(Doc. # 41), filed on January 26, 2009.  For the reasons that
follow, Defendant's summary judgment motion is denied.

## I.   Statement of the Case

Plaintiff Steven Cotten seeks unpaid overtime wages under
the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et
seq.  Cotten was continuously employed as a Field Supervisor
with Defendant HFS-USA, Inc. ("HFS"), from January 18, 2005,
through his termination on July 23, 2007.[1]  (Doc. ## 24-4,
Cotten Dep. at 9; 42, Cotten Decl. at 1).  Cotten's initial
salary was $800 per week, and he received a series of wage
increases until ultimately he was receiving a salary of

_____

[1] Plaintiff was terminated due to a reduction in work
force.  (Doc. # 24-4, Cotten Dep. at 9).

$910.50 per week as of his termination date. (Doc. # 24 at 3-4). Cotten alleges that he worked approximately 55 hours per week during his employment with HFS, but that he never received overtime compensation for those hours worked in excess of forty hours per week. (Doc. ## 24-4, Cotten Dep. at 14; 42, Cotten Decl. at 9).

HFS has filed a motion for summary judgment, alleging that it is exempt from the overtime provisions of FLSA under the "administrative exemption" as set forth in § 213(a) of FLSA and the U.S. Department of Labor, Wage, and Hour Division's ("DOL") attendant regulations. (Doc. # 24 at 1). HFS asserts that there is no genuine issue of material fact that "[Cotten's] job duties and the manner in which he was compensated during his employment with HFS satisfy all of the elements of the test for the administrative exemption." (Id. at 2). Cotten, on the other hand, argues that he is not exempt from receiving overtime compensation because his primary duties at HFS were not directly related to HFS's management or general business operations or its customers, nor did his duties require "the exercise of discretion and independent judgment with respect to matters of significance on [HFS's] behalf." (Doc. # 41 at 1).

## II. **Background**

HFS is a provider of home finishing services to

2

residential builders, including the installation of tile and hardwood flooring, carpet, bathroom tile, decorative trim and molding, window fashions, and exterior stone and pavers. (Doc. # 24-2, Crowder Dep. at 16). HFS operates several branches throughout Florida. (Id. at 4).

According to Stanford Barry Crowder, president of HFS,[2] sales managers at HFS generally negotiate contracts with builders to perform the finishing work within a residential development. (Id. at 16). The contracts specify the scope of the work to be performed, the materials to be used, and the price per square foot that will be charged. (Id. at 17). The type of materials to be installed in each job is predetermined by the builder-customer. (Id.) The installations are completed by subcontractors ("installers"), who are generally paid according to a pre-determined square-foot fee, depending on the type of installation to be performed. (Id.; Doc. # 24-4, Cotten Dep. at 22). Field supervisors do not typically have any involvement in determining the unit pricing for such installations. (Doc. # 24-2, Crowder Dep. at 18).

During the relevant time period, HFS was staffed with, among other employees, a branch manager, a regional sales manager, a lead project manager, an operations manager and

---

[2] Prior to his appointment as president of HFS in October 2007, Crowder was employed as a general manager with HFS. (Doc. # 24-2, Crowder Dep. at 5).

several field supervisors, project coordinators, and service technicians. (Doc. ## 24 at 3; 41 at 1). At all times relevant to this case, Cotten worked as a field supervisor in HFS's Tampa branch. (Doc. # 24-2, Crowder Dep. at 10). HFS's General Job Summary for the position of field supervisor, dated November 1, 2006, states:

> The Field Supervisor Level II is responsible for managing assigned builder job sites and contract installers to ensure that the correct products ordered by the customer are installed accurately, on time and with no additional costs to HFS. Once the projected work is received a preliminary inspection is conducted and [the field supervisor] completes a take off and informs the Project Manager of the needs and schedules the date for the installation per the builders request.

(Doc. # 24-3 at 1).

In Tampa, field supervisors reported directly to an "operations manager." (Doc. ## 24-2, Crowder Dep. at 9; 42, Cotten Decl. at 2). According to Crowder, operations managers were generally responsible for ordering materials and managing any problems that arose in connection with the field supervisors' day-to-day activities. (Doc. # 24-2, Crowder Dep. at 20, 42-45). For example, an operations manager would deal directly with a supplier when materials were late in arriving or arrange for extra installers in the event that an installation was behind schedule. (Id.). In addition, operations managers sometimes handled problems or disagreements that arose between builders and field

supervisors.  (Id.).  Cotten has attested that he spoke with his operations manager "on average 1-3 times per day." (Doc. # 42, Cotten Decl. at 2).

In addition, each job was assigned a "project manager" who was responsible for creating and distributing work orders and ordering materials for each installation job.[3]  (Doc. # 42, Cotten Decl. at 3).  Project managers also communicated with builders regarding scheduling of installations.  (Id.). Although a field supervisor could consult with the project manager regarding some of the same issues as were addressed by the operations manager, any dissatisfaction with the project manager's response was taken up with the operations manager. (Id. at 43).

Cotten attests that he began a typical workday at the branch office picking up work orders from one or more project managers.  (Doc. # 42, Cotten Decl. at 4).  The work orders set forth the type of installation work to be performed and the materials to be used.  (Doc. # 24-4, Cotten Dep. at 19). On some occasions, Cotten would then proceed to the warehouse to distribute the work orders to the installers and ensure that the installers loaded the correct type and quantity of

---

[3] The position formerly known as "project manager" was renamed "project coordinator" in early 2007.  (Doc. # 24-2, Crowder Dep. at 20).  For consistency, this position will be referenced as project manager throughout this Order.

materials.  (<u>Id.</u> at 43.)

Before an installation job could begin, Cotten had to go to the site and visually inspect the surface on which the installation was to be made for defects that might affect the installation.  (Doc. # 42, Cotten Decl. at 5).  Cotten attests that he was simply inspecting for conformance with general industry standards or those set by the builders or installers. (<u>Id.</u>).  For example, Cotten would examine the concrete slab on which tile was to be laid to see if it was cracked, out of square, or uneven.  (<u>Id.</u>).

If no defects were detected, Cotten would sign off on the site and the installation would proceed as previously scheduled.  (<u>Id.</u> at 5-6).  If a minor defect was discovered, Cotten would discuss with the builder how he wanted it to be handled.  (<u>Id.</u> at 6).  For the usual small repair priced in the $50 to $200 range, Cotten would direct an installer to perform the work and would then submit paperwork to the branch office for payment to the installer.  (<u>Id.</u>).  For significant repairs or additional work requested by the builder ("add-ons"), Cotten consulted with his project manager or operations manager, who would either address the problems themselves or provide a price for Cotten to quote to the installer or builder.  (<u>Id.</u>).

Cotten was also responsible for monitoring ongoing

installations, to ensure that work was being completed on schedule and in conformance with the work order, builder specifications, and general industry standards. (<u>Id.</u>). For example, Cotten verified that grout lines on tile installations were properly spaced and aligned. (<u>Id.</u> at 6-7). Post-installation, Cotten again inspected the work for compliance with the work order, builder specifications, and industry standards and, if the work was satisfactory, he completed a form so that the installer could be paid by HFS. (<u>Id.</u> at 7).

If the work was sub-standard, Cotten arranged for repair work by the initial installer or, on rare occasions, he would retain a second installer to finish the work. (<u>Id.</u> at 7). Again, Cotten would authorize small repairs of less than $200, but sought guidance from supervisors for work over that amount. (<u>Id.</u> at 7; Doc. # 24-4, Cotten Dep. at 21-22). If a second installer was brought in to repair mistakes made by the initial installer, a certain amount was often held back from the initial installer's fee to pay for the second installer's work. (Doc. # 24-4, Cotten Dep. at 21). This arrangement was called a "charge-back." (<u>Id.</u>). Cotten authorized charge-backs of up to $200 or so, but sought approval of his operations manager for charge-backs in excess of that amount. (<u>Id.</u> at 47).

In addition, warranty work was sometimes required after a job had been completed. Most of the time, independent service technicians with HFS's warranty department would take care of this work. (Id. at 35). However, on occasion, Cotten would perform a warranty repair himself if it was "quick and easy." (Doc. ## 42, Cotten Decl. at 8; 24-4, Cotten Dep. at 41-43).

## III. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law.

<u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856

(11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## IV.  <u>Analysis</u>

### A.  **FLSA and the Administrative Exemption**

Section 207 of FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  An employer is exempt from FLSA's overtime requirement if the employee is "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

HFS claims that Cotten was an administrative employee and thus exempt from FLSA overtime requirements.  Coverage under FLSA is to be liberally construed in favor of the employee and its exemptions narrowly applied against the employer.  <u>Birdwell v. City of Gadsden, Ala.</u>, 970 F.2d 802, 808 (11th Cir. 1992) (citations omitted).  Thus, the employer bears the burden of establishing a particular exemption by "clear and affirmative evidence."  <u>Id.</u>

Pursuant to the federal regulations guiding implementation of FLSA, an employee is considered a bona fide administrative employee if he is compensated at a rate of not less than $455 per week, his primary work duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and his primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The parties agree that Cotten meets the salary requirement of the exemption. Thus, HFS must establish that both the second and third elements of the test have been met with respect to Cotten.

In support of its summary judgment motion, HFS relies primarily on deposition testimony of corporate representative Crowder in describing the scope of Cotten's duties. However, Crowder's testimony is limited to a description of the general duties of an employee holding the position of field supervisor and his observations regarding the types of activities that a field supervisor might perform. Crowder did not work directly with Cotten and Crowder admits that he had no direct knowledge as to whether Cotten performed any of the activities he describes. (see e.g. Doc. # 24-2, Crowder Dep. at 2, 6, 14, 16, 18-19, 35) ("Mr. Cotten would obviously have the best

knowledge of what he did on a day-to-day basis because he was alone.").  On the other hand, Cotten's deposition testimony and sworn declaration attest to Cotten's own activities while he was employed as a field supervisor with HFS.

### 1. Primary Duty Directly Related to Management or General Business Operations

The federal regulations explain that the phrase "directly related to the management or general business operations" means that the type of work performed by the employee is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a). This prong is met if the employee "engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs."  Talbott v. Lakeview Ctr., Inc., No. 3:06cv378/MCR/MD, 2008 WL 4525012, at *4 (N.D. Fla. Sept. 30, 2008) (quoting Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002)).  The regulations note that this type of work

> includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations;

12

> public relations; government relations; computer
> network, internet and database administration;
> legal and regulatory compliance; and similar
> activities.

29 C.F.R. § 541.201(b).

HFS contends that Cotten met this prong of the administrative exemption test because 95% of his work time involved functional areas listed in the regulation, such as "budgeting, auditing, quality control, purchasing, safety and health, personnel management, and labor relations." (Doc. # 24 at 17). In addition, Cotten did not perform manual labor other than "occasional repairs" at job sites, which encompassed no more than three hours per week. (Id. at 16). Because the evidence shows that Cotten spent the majority of his time performing non-manual tasks directly related to HFS's management or business operations, HFS asserts that it is entitled to summary judgment on this element of the administrative exemption test.

Cotten disputes HFS's characterization of his work duties, arguing that his primary duty was one of production rather than administration. (Doc. # 41 at 14). Cotten contends that his work involved "the very product HFS exists to provide – finishing services." (Id.). In addition, Cotten asserts that he was not involved in running the business or determining its course or policies; he was simply "baby-sitting" the installations to ensure that they were completed

in a timely manner in compliance with "well-accepted industry standards and the specifications set forth in the builders' contracts." (Id.).

Application of the distinction between production and administrative duties is not limited to the traditional manufacturing context. In a service industry, production activities relate to the "primary service goal" of the entity. Smith v. City of Jackson, Miss., 954 F.2d 296, 299 (5th Cir. 1992). In this case, HFS's primary service goal was installation of finishing products in conformance with contracts between HFS and builders.

Based on the undisputed evidence before the Court, it cannot be said that Cotten's primary duties as a field supervisor were directly related to the management or general business operations of HFS. Although it can be said that Cotten "managed" certain assigned installation sites, his duties were concerned with ensuring that the installers received their work orders, retrieved the correct materials from the warehouse, and completed the installation job as specified in the contract and the work order and in compliance with specified standards. Cotten was not responsible for negotiating or executing contracts, creating work orders, or developing the applicable standards.

It is true that Cotten performed only a minimal amount of

manual labor. However, he did not, as the regulation requires, primarily perform "office" work that was directly related to HFS's general business operations. 29 C.F.R. § 541.200(a)(2). It is clear from the testimony of both Crowder and Cotten that Cotten did not work at the branch office and did not perform duties directly related to HFS's financing, budgeting, accounting, auditing, research, employee benefits, taxes, insurance, advertising, or computer technology. Cotten was not involved in formulating business policies or procedures. Cotten has attested that security and safety issues on the job site were the responsibility of the builders who ran the job sites. (Doc. # 42, Cotten Decl. at 9).[4]

Cotten merely completed pre-printed inspection and work-report forms, noting the status of various ongoing jobs. (Id. at 2). This paperwork was completed by Cotten while he was in the field, in his truck, or at his home. (Id.). Paperwork was then submitted to the branch office for further processing or approval. (Id.).

Cotten's job duties are precisely the type that have been

---

[4] Crowder asserts that field supervisors were responsible for ensuring that subcontractors were in compliance with OSHA standards. However, when asked whether there were any documents or paperwork saying that a field supervisor had that responsibility, Crowder replied, "Our safety handbook probably calls for everybody to be involved in safety. And because the field supervisor is HFS's only representative on the builder job site, that would automatically make them responsible for safety." (Doc. # 24-2, Crowder Dep. at 25).

found to be consistent with production rather than administration. For example, in <u>Sack v. Miami Helicopter Service, Inc.</u>, a court in the Southern District of Florida determined that an employee's duties of opening work orders, planning repair work, ordering required materials, directing mechanics as to what work to perform, determining whether certain parts complied with F.A.A. standards, and directing repair or replacement of parts that failed inspection did not qualify as administrative tasks related to operation of the business. 986 F. Supp. 1456, 1470-71 (S.D. Fla. 1997). The court found that these activities were an integral part of the production of the business and therefore did not directly relate to management policies or general business operations. <u>Id.</u>

Similarly, in <u>Gottlieb v. Construction Services & Consultants, Inc.</u>, the court considered whether the job duties of a project supervisor for a company engaged in the business of constructing shells for houses satisfied the requirements of the administrative exemption under FLSA. No. 05-14139-CIV, 2006 WL 5503644, at *1-2 (S.D. Fla. July 24, 2006). The shell included the foundation, exterior walls, and roof of the structure. <u>Id.</u> at *1. As in this case, the employer in <u>Gottlieb</u> used subcontractors for every phase of the job and employed project supervisors to schedule the contractors and

inspect their work. Id. The plaintiff, as project supervisor, was responsible for, among others things, coordinating and scheduling the work of subcontractors, ordering supplies, billing on his construction site, being the company's representative on the construction site, and inspecting the work of subcontractors. (Id. at 2).

The court found that the plaintiff's primary duties of scheduling subcontractors and delivery of supplies to ensure that they were in the proper place at the proper time, and inspecting the work of the subcontractors to ensure that it was in compliance with the builder's plans, did not constitute work directly related to the management or general business operations of the employer. Id. at *6. Instead, the court characterized the plaintiff's work as "producing the product [the defendant] existed to market rather than servicing [the defendant] itself." Id. The court concluded that the fact that the plaintiff's work was important to the employer and affected its profitability and reputation was not dispositive of his status as an administrative employee, as the plaintiff had no involvement with personnel and accounts payable and receivable departments, and was not involved in formulating policy or making major decisions for the employer. Id.

Here, Cotten's job duties are almost identical to those of the plaintiff in Gottlieb. HFS argues that Cotten had

significantly more responsibilities than the plaintiff in
Gottlieb, such as hiring subcontractors or negotiating and
entering into agreements with subcontractors and builders.
(Doc. # 24 at 21). However, Cotten did not interview or hire
new subcontractors, he merely assigned work to subcontractors
who were on HFS's approved list. The only time that Cotten
entered into "agreements" with builders or subcontractors was
when a defect at the site needed to be repaired or the builder
wanted additional work performed. (Doc. # 42, Cotten Decl. at
6). Even in those instances, however, any significant repairs
or issues were referred to the project manager or operations
manager. (Id.).

HFS contends that the facts of this case are more
analogous to Black v. Colaska, Inc., No. C07-823JLR, 2008 WL
4681567 (W.D. Wash. Oct. 20, 2008), where the district court
found that the plaintiff, a project manager for a construction
company, was an exempt administrative employee. Id. at *7.
In Black, however, the project manager had significantly more
responsibilities related to management and general business
operations than Cotten did at HFS. There, the plaintiff's
responsibilities included estimating and bidding new jobs;
signing subcontracts on behalf of the defendant; determining
the hours worked by the crew; scheduling the work; creating
project schedules and sequencing the work; signing pay

estimates; inputting crew members' time cards; drafting and ensuring compliance with owner-required plans; and, along with another employee, preparing monthly cost analyses and completing margin analyses on specific projects. Id. at **6, 9. In addition, the plaintiff was responsible for tracking the quantity of work completed in a day against the budget to ensure that each project to which he was assigned was profitable. Id. at *1.

Thus, the plaintiff in Black regularly performed work in several of the functional areas set forth in the regulations, such as auditing, budgeting, purchasing, procurement, and personnel management. See 29 C.F.R. § 541.201(b). The fact that he was responsible for ensuring the profitability of each job was also key to the court's ultimate determination that the employee performed work directly related to the employer's management and general business operations. Id. at *9. In contrast, Cotten performed no accounting or budgeting tasks, did not sign subcontracts on behalf of HFS, did not create project schedules, did not create work orders, and never drafted any plans. Nor did Cotten have primary responsibility for the profitability of the projects. Cotten had several senior supervisors who handled any significant issues relating to costs, work outside of the scope of the work order, or problems with builders or suppliers. Thus, the Court finds

19

that Cotten's primary duties are more akin to those of the non-exempt employee in <u>Gottlieb</u>.

Based on the record evidence, HFS has not met its burden in establishing that Cotten's primary duties were directly related to the management or general business operations of HFS. Summary judgment may thus be denied because HFS has failed to satisfy the second prong of the administrative exemption test. Nevertheless, the Court will proceed with an analysis of the third prong of the test.

> **2. Exercise of Discretion and Independent Judgment with Respect to Matters of Significance**

According to the federal regulations, the third element of the administrative exemption test requires that an employee's primary duties involve "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). "The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." <u>Id.</u> at § 541.202(b).

The regulations provide a non-exhaustive list of factors that may be considered when determining whether an employee exercises discretion:

> [W]hether the employee has authority to formulate affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

Based on the undisputed evidence in this case, the Court cannot find as a matter of law that Cotten's primary duties at HFS involved the exercise of discretion and independent judgment with respect to matters of significance. Although Cotten had the authority to set prices for add-ons, minor repairs, or warranty work that was not contemplated in the original contract or work order, that authority was limited to minor and routine tasks involving minimal charges. (Doc. # 42, Cotten Decl. at 6). In most instances, Cotten received direction from his project manager or operations manager regarding the price to charge for any such additional work,

and he simply relayed that amount to the builder or installer. (Id.). All paperwork regarding the additional work was then submitted to HFS's administrative office for processing and payment. (Id.). Cotten's discretion was so limited that even $50 to $200 repairs submitted by Cotten were "often overruled" by the project manager on the installation. (Id.).

Cotten spent much of his time performing inspections, which took place at all phases of the installation process. These inspections were conducted according to pre-established industry standards or the terms of the particular contract. (Id. at 5). Cotten had no specialized training and simply compared what he saw at the job site with the standards he had previously been directed to conform with. (Id.). He filled out forms documenting the inspection results, and spoke with builders or his supervisors when defects were noted. (Id.). These routine inspection duties did not require the exercise of significant discretion or independent judgment.

In fact, the federal regulations specifically exclude "ordinary inspection work" from the administrative exemption. 29 C.F.R. § 541.203(g). Section 541.203(g) provides,

> Ordinary inspection work generally does not meet the duties requirements for the administrative exemption. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or

22

> experience. They have some leeway in the
> performance of their work but only within closely
> prescribed limits.

This section aptly describes Cotten's inspection activities, and therefore those activities do not qualify as being directly related to management policies or general business operations.

Of course, Cotten's duties were not limited to inspections. If an installation was not completed properly or on time, Cotten was responsible for bringing the job into compliance, either by directing the original installer to make the necessary repairs or, on rare occasions, by retaining a second installer to do the necessary work. Although Crowder has attested that field supervisors were free to assign "the installers of their choice" to a particular job, this is not entirely true. (Doc. # 24-2, Crowder Dep. at 13). HFS maintained a list of qualified installers that field supervisors were required to use. (Id.). Cotten has sworn that he never used an installer that was not on the approved list. (Doc. # 42, Cotten Decl. at 5).

HFS also maintains that Cotten "had the discretion to place installations on hold pending completion of pre-installation repairs" and "had discretion concerning whether or not HFS's installers would be paid after they completed an installation." (Doc. # 24 at 19). The decisions to delay

installation or payment of subcontractors cannot be characterized as discretionary when those actions were the natural consequence of a failed inspection. Cotten had no choice but to postpone an installation until the surface was properly prepared. Likewise, an installer could only get paid if Cotten signed off that the installation complied with necessary standards. (Doc. # 42, Cotten Decl. at 7). There was no discretion involved; the installer was paid by HFS when the job was satisfactorily completed.

Crowder has asserted in his deposition that field supervisors were "probably our primary recruiter of qualified subcontractors. (Doc. # 24-2, Crowder Dep. at 13). As an example, Crowder described a scenario whereby a field supervisor sees an installer performing quality work for another company within his subdivision and he then invites that installer to do work for HFS. (Id.). The field supervisor might then question the installer regarding his qualifications. (Id.). Even if the field supervisor was the initial "recruiter" of an installer, however, Crowder admitted that a field supervisor could not add a new subcontractor to the approved list. (Id.). HFS's compliance department had to review an installer's paperwork and approve them before they could be added to the list. (Id. at 13-14). Cotten has attested that he was aware that some field supervisors

24

recommended certain installers be added to the list, however, he never did so and he understood that only "senior" field supervisors could make such a recommendation. (Doc. # 42, Cotten Decl. at 7).

Upon due consideration of the record evidence regarding Cotten's work activities, the Court concludes that Cotten's primary duties at HFS did not involve the exercise of discretion and independent judgment with respect to matters of significance. As previously discussed, cases considering employees with very similar duties to Cotten have declined to apply the administrative exemption.

The employee in <u>Gottlieb</u> was employed as a project supervisor in a construction company and his responsibilities included scheduling subcontractors, ordering supplies, billing on the construction site, and inspecting to make sure the subcontractors' work complied with the "blue prints, truss prints, and start up sheets.". <u>Gottlieb</u>, 2006 WL 5503644, at *2. Although the <u>Gottlieb</u> plaintiff could make certain decisions on his own without consultation with his area manager, the district court found that "all 'matters of significance' were determined by Plaintiff's superiors." <u>Id.</u> at *7. For example, the plaintiff could not hire a subcontractor that was not on his area manager's approved list. <u>Id.</u> The decision to back-charge a subcontractor for

work left unfinished was also made by the plaintiff's area manager. Id.

For those decisions that the plaintiff made on his own, the Gottlieb court characterized them as being "based on his skill and experience in the construction industry." Id. Under the FLSA regulations, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id.; 29 C.F.R. 541.202(e). Thus, the court found that the third prong of the administrative exemption test was not met. Gottlieb, 2006 WL 5503644, at *7.

In this case, the majority of Cotten's decisions were based on information gained through his years of experience in construction, well established standards in the industry, or simple application of "common sense" as to the propriety of a certain action. (Doc. ## 24-4, Cotten Dep. at 21-22; 42, Cotten Decl. at 5-9). Unless a simple repair or a charge of less than $200 was involved, Cotten sought approval from his supervisors regarding changes in work-orders, add-ons, back-charges, and pricing for additional work or warranty work. (Doc. ## 24-4, Cotten Dep. at 20-22; 42, Cotten Decl. at 6-8). Other than the small charges previously discussed, all work by installers was paid according to a predetermined square-foot

price. (Doc. ## 24-4, Cotten Dep. at 22; 42, Cotten Decl. at 3). In addition, supervisors were on site with Cotten approximately 20% of the time and he spoke with his operations manager one to three times per day. (Doc. ## 24-4, Cotten Dep. at 23; 42, Cotten Decl. at 6-8).

The Court has carefully considered Cotten's activities and responsibilities during his employment at HFS and analyzed his work under both the provisions of FLSA and the implementing regulations thereto. Based on this analysis, the Court finds that HFS has failed to meet its burden in establishing that Cotten is exempt under the third prong of the administration exemption test. Consequently, HFS's motion for summary judgment as to its affirmative defense that Cotten was employed in a bona fide administrative capacity is denied.

Accordingly, it is

**ORDERED**, **ADJUDGED and DECREED** that**:**

Defendant HFS-USA, Inc.'s Motion for Summary Judgment (Doc. # 24) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>18th</u> day of May 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record